**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REYNOSO VINEYARDS, INC., | Case No. 24-15572 |
| Debtor. | Hon. Deborah L. Thorne |

**NOTICE OF EMERGENCY MOTION**

To:     See Attached List

**PLEASE TAKE NOTICE** that on **March 25, 2025, at 10:00 a.m**., I will appear before the Honorable Deborah L. Thorne, or any judge sitting in that judge's place, **either** in courtroom 682 of the United States Courthouse, 219 S. Dearborn Street, Chicago, Il 60604 **or** electronically as described below, and present the **Trustee's Emergency Motion For Interim And Final Orders: (I) Authorizing Trustee To Obtain Postpetition Financing; (II) Granting Liens And Security Interests And Superpriority Claims; (III) Scheduling Final Hearing; And (IV) Granting Related Relief,** a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode.** The meeting ID for this hearing is 160 9362 1728 - no passcode required. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

Janina M. Hoskins, not individually, but as chapter 11 Trustee for the Estate of Reynoso Vineyards, Inc.

Dated: March 21, 2025          By:   /s/ Allen J. Guon
                                        One of her attorneys

LEGAL\76171115\4

Allen J. Guon
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
P: (312) 474-1647
aguon@cozen.com

## CERTIFICATE OF SERVICE

Allen J. Guon, an attorney, certifies that he caused to be served a copy of **Notice of Emergency Motion** and **Trustee's Emergency Motion For Interim And Final Orders: (I) Authorizing Trustee To Obtain Postpetition Financing; (II) Granting Liens And Security Interests And Superpriority Claims; (III) Scheduling Final Hearing; And (IV) Granting Related Relief** upon the Electronic Mail Notice List through the ECF System which sent notification of such filing via electronic means (unless otherwise indicated) on March 21, 2025.

/s/ Allen J. Guon

## Mailing Information for Case 24-15572

**Electronic Mail Notice List through ECF**

- **Ira Bodenstein**   ibodenstein@cozen.com, ira-bodenstein-9561@ecf.pacerpro.com
- **Adam G. Brief**   Ustpregion11.es.ecf@usdoj.gov
- **Jeffrey C Dan**   jeffd@goldmclaw.com, kerame@goldmclaw.com;katelynnet@goldmclaw.com
- **Dennis A Dressler**   ddressler@dresslerpeters.com, rmccandless@dresslerpeters.com
- **Jeffrey L. Gansberg**   jeffrey.l.gansberg@usdoj.gov
- **Michael J Greco**   michaelgreco18@yahoo.com, highplainslawyer@hotmail.com
- **Allen J Guon**   aguon@cozen.com, allen-guon-6333@ecf.pacerpro.com;cknez@cozen.com
- **Janina M Hoskins**   jmelder7@aol.com, CA80@ecfcbis.com
- **Jordan A. Lavinsky**   jlavinsky@hansonbridgett.com
- **Matthew E. McClintock**   mattm@goldmclaw.com, katelynnet@goldmclaw.com;harleyg@restructuringshop.com
- **Mark Melickian**   mmelickian@raineslaw.com, joconnor@sfgh.com;mbrandess@sfgh.com;bkdocket@sfgh.com;bkdocket@sfgh.com
- **Michelle G Novick**   michelle.novick@saul.com, monica.williams@saul.com
- **Kenneth D Peters**   kpeters@dresslerpeters.com, ehunter@dresslerpeters.com
- **Carolina Y. Sales**   csales@robbinsdimonte.com, mrussell@robbinsdimonte.com;jtronina@robbinsdimonte.com
- **Michael Traison**   mtraison@cullenanddykman.com

LEGAL\76171115\4

**Manual Notice List (in the manner indicated)**

Reynoso Vineyards, Inc.
365 N Jefferson St.
Unit 3408
Chicago, IL 60661
(Via FedEx)

Bachecki, Crom & Co., LLP
400 Oyster Point Blvd., Suite 106
South San Francisco, CA 94080
(Via FedEx)

Summit State Bank
c/o Heather Merriott
500 Bicentennial Way
Santa Rosa, CA 95403
(Via FedEx)

CHTD Company
PO Box 2576
Springfield, IL 62708
(Via USPS Overnight)

CT Corporation System, as representative
330 N. Brand Blvd., Suite 700 Attn: SPRS
Glendale, CA 91203
(Via FedEx)

GK Development, Inc.
257 E. Main Street, Suite 200
Barrington, IL 60010
(Via FedEx)

Keith Daunbenspeck
906 Lake Drive
New Buffalo, MI 49117
(Via FedEx)

The William C. Holtz Trust
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(Via FedEx)

William C Holtz Trust
836 Miramar Ct.
Cape Coral, FL 33904
(Via FedEx)

William Holtz Trust
660 Panama Court #214
Marco Island, FL 34145
(Via FedEx)

Department of the Treasury
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101
(Via USPS Overnight)

Illinois Department of Revenue
Bankruptcy Unit
P O Box 19035
Springfield, IL 62794-9035
(Via USPS Overnight)

Illinois Department of Employment Security
Benefit Payment Control Division
P O Box 4385
Chicago, IL 60680
(Via USPS Overnight)

California Employment Development Dept.
P.O. Box 826276
Sacramento, CA 94230-6276
(Via USPS Overnight)

California Department of Tax and Fee
Administration
Account Information  Group, MIC 29
P.O. Box 942879
Sacramento, CA 94279-0029
(Via USPS Overnight)

3

Bankruptcy Section Manager, MS A340
Franchise Tax Board
PO Box 2952
Sacramento, CA 95812-2952
(Via USPS Overnight)

Sonoma County Treasurer- Tax Collector
585 Fiscal Drive, Suite 100
Santa Rosa, CA 95403
(Via FedEx)

Jacksonstreet Futuretech 678 Holdings Trust
9121 Camelbank Drive
Austin, TX 78733
(Via FedEx)

Jacksonstreet Futuretech 678 Holdings Trust
Attn: Larry O'Connor
44 East Avenue, 3rd Floor
Austin, TX 78701
(Via FedEx)

Jacksonstreet Futuretech 678 Holdings Trust
c/o Other World Computing
44 East Avenue, 3rd Floor
Austin, TX 78701
(Via FedEx)

First American Title Company of Napa,
Trustee
1700 2nd Street # 120
Napa, CA 94559
(Via FedEx)

Alto Service Corporation
PO Box 6188
Santa Rosa, CA 95406
(Via USPS Overnight)

Poppy Bank
Santa Rosa Main Office
438 First Street
Santa Rosa, CA 95401
(Via FedEx)

Metropolitan Capital Bank & Trust
Nine East Ontario Street
Chicago, IL 60611
(Via FedEx)

Fidelity National Title Company, Trustee
1101 College Ave., Suite 100
Santa Rosa, CA 95404
(Via FedEx)

Fidelity National Title Company, Trustee
600 Bicentennial Way, Suite 300
Santa Rosa, CA 95403
(Via FedEx)

Summit State Bank
PO Box 6188
500 Bicentennial Way
Santa Rosa, CA 95406
(Via FedEx)

Redwood Trust Deed Services, Inc.
P.O. Box 6875
Santa Rosa, CA 95406-0875
(Via USPS Overnight)

Redwood Trust Deed Services, Inc.,
As Trustee, Attn: Robert Cullen
P.O. Box 6875
Santa Rosa, CA 95406-0875
(Via USPS Overnight)

Chicago Title Insurance Company, Trustee
725 S. Figueroa Street, Suite 200
Los Angeles, CA 90017
(Via FedEx)

Paul Krause
PO Box 1334
Verdi, NV 89439
(Via USPS Overnight)

4

LEGAL\76171115\4

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REYNOSO VINEYARDS, INC., | Case No. 24-15572 |
| Debtor. | Hon. Deborah L. Thorne |

**TRUSTEE'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:
(I) AUTHORIZING TRUSTEE TO OBTAIN POSTPETITION FINANCING;
(II) GRANTING LIENS AND SECURITY INTERESTS AND SUPERPRIORITY
CLAIMS; (III) SCHEDULING FINAL HEARING; AND
(IV) GRANTING RELATED RELIEF**

Janina M. Hoskins, not individually, but as chapter 11 trustee (the "Trustee") for the bankruptcy estate of Reynoso Vineyards, Inc. (the "Estate"), respectfully moves for the entry of interim and final orders authorizing the Trustee to obtain postpetition financing from Summit State Bank ("Summit" or "DIP Lender"). In support thereof, the Trustee respectfully states as follows:

**I. RELIEF REQUESTED**

1. Through this motion, the Trustee seeks the entry of interim and final orders, substantially in the form of the interim order attached hereto as **Exhibit 1[1]** and a final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order"):

    i.   authorizing the Trustee to obtain secured postpetition financing on a superpriority basis (the "DIP Loans"), including the Loan 1 Roll-Up (as defined below), pursuant to the terms and conditions of that certain Priming Superpriority Debtor-In-Possession Credit Agreement attached hereto as **Exhibit 2** (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Loan Agreement"), by and between the

---

[1] The proposed Interim Order remains subject to final approval of the parties

Trustee, and Summit in its capacity as the DIP Lender under the DIP Loan Agreement;[2]

ii. authorizing the Trustee to execute the DIP Loan Agreement and all other documents, instruments, or agreements executed and delivered by the Trustee for the benefit of the DIP Lender in connection therewith, collectively with the DIP Loan Agreement, the "DIP Loan Documents");

iii. authorizing the Trustee to consummate the transactions contemplated by the DIP Loan Documents;

iv. granting to the Lender the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Loans and all obligations owing and outstanding under the DIP Loan Documents, and the Interim Order and any Final Order, as applicable (collectively, the "DIP Obligations," subject only to prior payment of the Carve-Out;

v. granting allowed superpriority administrative expense claims to the Lender in connection with the DIP Loans;

vi. scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order; and

vii. granting such other and further relief as this Court deems necessary and just.

## II.  BANKRUPTCY RULE 4001 DISCLOSURES

2. As required by Fed. R. Bankr. P. 4001(c) and Local Rule 4001-2(A)(3), the material terms of the postpetition financing (the "Postpetition Financing") are as follows:

a. **Borrowing Limit**. The DIP Lender shall extend to the Trustee, upon entry of the Interim Order, an amount not to exceed $300,000 of new money, and upon entry of the Final Order, an amount not to exceed $1,000,000.00 of new money, or, in each case, such lesser amount as determined in accordance with the Financing Orders and the Budget. For the avoidance of any doubt, the new money provided under the DIP Loan Commitment shall be exclusive of any amounts that become a

---

[2] As discussed below, Summit is also a senior secured prepetition lender to the Debtor.

2

DIP Obligation pursuant to the Loan 1 Roll-Up. [DIP Loan Agreement § 1.1 "DIP Loan Commitment".]

b. **Interest Rate**. The non-default rate of interest is 10% per annum. The default rate is equal to the non-default rate plus 2%. [DIP Loan Agreement § 2.5.]

c. **Maturity**. All DIP Obligations under the Postpetition Financing shall be due and payable upon the earliest of (i) December 31, 2025, (ii) the closing date of a sale of all or substantially all of Estate's real estate pursuant to an order entered by the Court (or, in the event of more than one sale, the closing date of the last of such sales), (iii) the date on which the DIP Lender is authorized to accelerate the DIP Obligations or the DIP Obligations otherwise become immediately due and payable, pursuant to the terms of the DIP Loan Agreement or of the Financing Orders, as applicable, or (iv) the effective date of a confirmed chapter 11 plan. [DIP Loan Agreement § 1.1 "Maturity".]

d. **Use of Proceeds**. The proceeds of the DIP Loan will be used by the Trustee, subject to and in accordance with the Budget (defined below) and the Financing Orders, solely for: (i) working capital and the Trustee's administration of the Estate, (ii) bankruptcy-related fees costs and expenses; and (iii) the Loan 1 Roll-Up. [DIP Loan Agreement § 2.3.]

e. **Events of Default.** The Events of Default include: (a) the failure by the Trustee to pay any of the DIP Obligations when due; (b) the Trustee takes any action to (i) impair any of the material rights and remedies of the DIP Lender under the DIP Loan Documents, (ii) avoid, subordinate, disallow, or require disgorgement by the DIP Lender of any amount received in respect of the DIP Obligations, or (iii) challenge the rights, liens or claims of the Pre-Petition Lender related to the Pre-Petition Obligations under Loan No. 1; provided, however, the Trustee shall have the right to challenge the DIP Lender's asserted Event of Default; (c) the Liens created by the DIP Loan Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral; and (d) the Interim Order and the Final Order, each in form and substance satisfactory to the DIP Lender, in its sole discretion, are not entered by the Bankruptcy Court by April 15, 2025 or the Financing Orders are among other things, modified without the Consent of the DIP Lender. [DIP Loan Agreement § 7.1.]

f. **Budget**. The Budget is attached to the DIP Loan Agreement as Exhibit A. The Trustee shall comply with the Budget (subject to

3

the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget, without the consent of the DIP Lender. The Trustee (i) shall not permit payments for any Measuring Period (as defined below) to exceed one hundred ten percent (110%) of the respective amounts, measured on an aggregate basis, as set forth for such Measuring Period. These variances (the "Variances") shall be measured and tested every month based on a rolling four-week period (the "Measuring Period"); provided, however, that any budgeted item not paid in the budgeted month may be paid in a later month.

3.      In addition, the Debtor makes the following disclosures regarding the terms of the proposed order (the "Financing Order") pursuant to Local Rule 4001-2(A)(2):

a.    **Provisions that grant cross-collateralization**. None.

b.    **Findings of fact that bind the estate regarding secured creditor's liens**. The Trustee (on behalf of the Estate) acknowledges and agrees that as of the date of the DIP Loan Agreement she has no defense, counterclaim, offset, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Estate's liability to repay the pre-petition obligations owed to the pre-petition lender under Loan No. 1. However, other than with respect to Loan No. 1, the Financing Orders shall provide that the Trustee (on behalf of the Estate) and other parties in interest shall have 75 days from the entry of the Interim Financing Order to investigate and challenge the validity, perfection, or amount of Pre-Petition Lender's Pre-Petition Liens or the Prepetition Indebtedness or the waiver of claims against the Pre-petition Lender. [DIP Loan Agreement §§ 8.16, 8.17.]

c.    **Provisions that waive rights under § 506(c)**. Yes. The Financing Orders must prohibit the assertion of claims arising under § 506(c) or 552(b) of the Bankruptcy Code against the DIP Lender or the commencement of other actions by the Trustee adverse to the DIP Lender or its respective rights and remedies under the DIP Loan Documents or the Financing Orders. [DIP Loan Agreement § 3.1(a)(iv).]

d.    **Provisions that grant liens on avoidance actions**. No. The definition of DIP Collateral expressly excludes any Action under chapter 5 of the Bankruptcy Code. [DIP Loan Agreement § 1.1 "DIP Collateral".]

4

e. **Prepetition roll-up provisions**. Yes. The DIP Loan includes the 'roll-up' of the Pre-petition Indebtedness owed to the Pre-petition Lender under Loan No. 1 as of the Petition Date (excluding attorneys' fees, default interest and late charges) on a dollar-for-dollar basis and the securing of such roll-up obligations equally and ratably with the Estate's obligations with respect to the DIP Loans and under the DIP Loan Documents (the "Loan 1 Roll-Up").

f. **Provisions differentiating the treatment of Committee professionals**. No committee has been appointed in this Case and there are no provisions for a committee in the DIP Loan Agreement.

g. **Provisions that prime secured liens without consent**. Yes. The Financing Orders approving and authorizing the DIP Loans and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to the DIP Lender in its reasonable discretion on the DIP Collateral. The DIP Lender shall be granted a first-priority and priming security interest and DIP Liens upon the DIP Collateral, subject only Permitted Liens and the carve-out for the benefit of the Estate, the Trustee and its professionals in the amount of a $75,000 the (the "Carve-Out") [DIP Loan Agreement § 1.1 "DIP Collateral"; §§ 3.1(a)(vii), 6.1, 7.1.]

h. **Declarations regarding lender liability**. None.

i. **Provisions on expedited stay relief**. The Final Order shall include, without limitation, provisions providing a process for the vacation of the automatic stay to permit the enforcement of the DIP Lender's rights and remedies under the DIP Loan Documents to the extent authorized under the DIP Loan Agreement. With respect to any such relief, however, the DIP Lender shall provide the Trustee with five (5) Business Days' written notice prior to seeking expedited relief from the Court. [DIP Loan Agreement §§ 3.1(a)(ii); 7.2.]

j. **Provisions on joint and several liability among debtors**. None.

### III. <u>JURISDICTION</u>

4.      On October 18, 2024 (the "Petition Date"), Reynoso Vineyards, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"), thereby commencing this chapter 11 bankruptcy case (the "Case") and creating the Debtor's bankruptcy estate (the "Estate").

5.      This Court has jurisdiction to hear this matter and enter a final order granting the relief requested herein pursuant to 28 U.S.C. §§ 157(b)(2) and 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue of this proceeding and the motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(D).

## IV.  BACKGROUND

### A.      The Trustee's Appointment

6.      On January 17, 2025, the Court entered its order directing the U.S. Trustee to appoint a chapter 11 trustee. A more complete description of the Debtor's business and events leading to the appointment of the Trustee is set forth in the *Order Directing the Office of the United States Trustee to Appoint a Chapter 11 Trustee*. [ECF No. 76.]

7.      On January 29, 2025, the Court entered an order confirming the appointment of Janina M. Hoskins as the chapter 11 trustee. [ECF No. 88.]

8.      On March 7, 2025, the Trustee filed her initial report pursuant to 11 U.S.C. § 1106(a)(5). [ECF No. 113.]

### B.      The Debtor's Real Estate and Vineyard Operations

9.      The Debtor owns a vineyard known as the Reynoso Estate Vineyards located at 25500 River Road, Cloverdale, California (the "Real Estate"). The Debtor's business consists primarily of growing grapes on the Real Estate and selling them to brokers and several of Sonoma Valley's wine producers – although the bulk of the Debtor's grapes are sold to Agathon Holdings GP LLC ("Agathon") and Musalacon Wine Group, Inc. ("Musalacon," and together with Agathon,

6

the "Reynoso Affiliates"), entities owned or controlled by Joseph Reynoso, the owner of the Debtor.

10. The Real Estate encompasses 395 acres of pristine land in the heart of Sonoma County's Alexander Valley. The Real Estate has over a mile of direct river frontage along the Russian River along with views of rolling hillsides and the Mayacamas Mountains. Of the total acreage, approximately 144 acres are planted with estate-grown grape vines, including a diverse portfolio of varietals.

11. The Real Estate also has five separate residences consisting of a 5,145 square foot main residence, a 1,726 sq. ft. managers residence, a 1,016 sq. ft. adobe house, and two smaller farm houses. It is the Trustee's understanding that Mr. Reynoso and his wife reside at the largest residence, his son and ex-wife reside in two residences and two of the vineyard employees live in the smallest residences. None of the individuals residing on the Real Estate pay rent to the Estate. The Trustee is unaware of any employment agreements with respect to the two employees living on site. However, the terms of their employment appear to include housing.

12. The Real Estate has sufficient ground water resources and has approximately one mile of Russian River ownership, which significantly increases the appeal of the Real Estate. The Sonoma County records indicate that Real Estate has not been subdivided and remains as one legal parcel.

13. The Trustee has reviewed and analyzed (i) the appraisal for the Real Estate prepared for Summit Bank July 17, 2024, which the Debtor relied on for the Real Estate's $23 million value as reflected the Debtor's amended bankruptcy schedules (the "Schedules") [ECF No. 90] and (ii) the market evaluations and pricing valuations as of January 30, 2025, that Coldwell Banker Realty and Sotheby's International Realty prepared at the request of Mr. Reynoso. The Trustee has

7

LEGAL\76171115\4

also interviewed several brokers (including both local and national brokerages) to determine additional valuations of the Real Estate and evaluate alternative marketing approaches. The Coldwell Banker analysis estimated the value of the vineyard portion of the Real Estate alone at $13 million.

14. The vineyard industry in Northern California is currently in a down cycle. Vineyards are taking longer to sell and their value has dropped by approximately 20-25% since July 2024. Given the current state of the marketplace, the Trustee's business judgment is that $19 million is an appropriate initial listing price for the Real Estate. Importantly, the value of the Real Estate is uniquely dependent upon a properly maintained and operating vineyard. In order to maximize value of the Property, the vineyard must be maintained and the 2025 grape crop must be viable. If the vineyard is not maintained and is not prepared for a 2025 grape crop, the real estate professionals estimate that the value of the Real Estate will decrease by approximately 30%.

15. On March 12, 2025, the Court entered an *Order Authorizing Trustee to Employ Coldwell Banker Realty as Real Estate Broker and Approving Compensation Arrangement*. [ECF No. 116.] The Trustee has already commenced marketing the Real Estate for sale with the assistance of her broker.

**C.     The Debtor's Prepetition Financing with Summit**

16. Summit is the Debtor's primary senior secured lender. The Debtor and Summit are parties to three loans that financed the Debtor's business operations (collectively, the "Summit Prepetition Loans"):

- A loan in the original principal amount of $600,000 evidenced by an Agricultural Loan Agreement and a Promissory Note each dated as of September 5, 2017 (as amended, modified and supplemented from time to time (the "Loan No. 1");

8

- A loan in the original principal amount of $6,294,594.75 as evidenced by a Business Loan Agreement and a Promissory Note each dated as of November 22, 2017 (as amended, modified and supplemented from time to time, the "Loan No. 2"); and

- A loan in the original principal amount of $2,098,198.25 as evidenced by a Promissory Note dated as of November 22, 2017 (as amended, modified and supplemented from time to time, the "Loan No. 3).

17. Loan No. 1 is secured by an Agricultural Security Agreement dated September 5, 2017 granting Summit a security interest in the Debtor's crops. On September 14, 2017, Summit filed UCC-1 financing statements with the Illinois Secretary of State (as amended on January 31, 2020 and continued on July 8, 2022) in connection with Loan No. 1.

18. Loan No. 1 is also secured by the Real Estate pursuant to a Deed of Trust dated September 26, 2024, and recorded on September 30, 2024, as document 2024045225, made among the Debtor, as grantor; Summit State Bank, as beneficiary; and Fidelity National Title Company, as Trustee, to secure an indebtedness of $600,000 under Loan No. 1 ("Loan 1 DOT").

19. Loan Nos. 2 and 3 are secured by a Deed of Trust dated November 22, 2017 and recorded December 8, 2017, as document 2017094442, made among the Debtor, as grantor; Summit State Bank, as beneficiary; and Alto Service Corporation, as Trustee,[3] to secure an indebtedness of $8,392,793 (the "Loan 2 and 3 DOT," and together with Loan DOT, the "Summit DOTs").

20. Summit asserts that the aggregate total balance due under the Summit Prepetition Loans as of March 19, 2025 is $9,874,844.17 (the "Summit Secured Claim") comprised of following balances:

---

[3] Redwood Trust Deed Services, Inc. is current Trustee under this Deed of Trust.

- Summit Loan No. 1: $681,918.93;[4]

- Summit Loan No. 2: $6,857,940.67; and

- Summit Loan No. 3 $2,334,984.57.

21. Summit further asserts that the Summit Secured Claim is secured by liens (any such liens, together, the "Prepetition Liens") against the Real Estate and the Debtor's crops (collectively, the "Prepetition Collateral").

22. As noted above, Summit recorded the Loan 1 DOT against the Real Estate during the 90-day period prior to the Petition Date. The Trustee believes that the Loan 1 DOT is potentially avoidable under § 547 of the Bankruptcy Code. Summit disputes the Trustee's position and alleges, without limitation, that the Loan 1 DOT was supported by a contemporaneous exchange for new value at the time of recording, and is therefore, not avoidable as a preference.

**D.     The Debtor's Other Prepetition Secured Indebtedness**

23. The Trustee and her professionals have requested and obtained certain business records from the Debtor's principal, Joseph Reynoso. While Mr. Reynoso has been cooperative, the Trustee's initial review of the Debtor's business records has confirmed that they are incomplete, unorganized and do not meet acceptable standards for a business of this type. As a result, the Debtor's Schedules are not a reliable source of information for claims against the Debtor.

24. The preliminary title report for the Real Estate obtained by the Trustee identified the following liens against the Real Estate in addition Summit's Prepetition Liens, identified above, some of which are inconsistent with the Schedules:

---

[4] A portion of Loan No. 1 will be waived upon approval of the DIP Financing. The Trustee is currently reconciling the balances of the Summit Prepetition Loans.

10

- Delinquent real property taxes for 2024-2025 – 1st installment $33,731.32;

- Real estate tax defaults for 2019-2020, 2022-2023 and 2023-2024 (amounts not listed);

- Deed of Trust and Assignment of Rents Securing a Promissory Note dated May 24, 2017 and recorded May 24, 2017, as document 2017040532, made among the Debtor, as grantor; Jacksonstreet Futuretech 678 Holdings Trust, as beneficiary; and First American Title Company, as Trustee, to secure an indebtedness of $750,000 ("Jacksonstreet DOT");[5]

- Deed of Trust dated May 14, 2018 and recorded May 29, 2018, as document 2018038711, made among the Debtor, as grantor; Poppy Bank, as beneficiary; and Fidelity National Title Company, as Trustee, to secure an indebtedness of $12,000,000 ("Poppy DOT");

- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 13, 2023 and recorded June 22, 2023, as document 2023027806, made among the Debtor, as grantor; Metropolitan Capital Bank & Trust, as beneficiary; and Chicago Title Insurance Company, as Trustee, to secure an indebtedness not to exceed $1,200,000 ("Metropolitan DOT");[6]

- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 31, 2023 and recorded August 3, 2023, as document 2023036247, made among the Debtor, as grantor; Keith Daubenspeck, as beneficiary; and Chicago Title Insurance Company, as Trustee, to secure an indebtedness of $150,000 ("Daubenspeck DOT");

- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 31, 2023 and recorded August 3, 2023, as document 2023036248, made among the Debtor, as grantor; William C Holtz Trust, as beneficiary; and Chicago Title Insurance Company, as Trustee, to secure an indebtedness of $150,000 ("Holtz DOT");

- Deed of Trust dated August 28, 2024 and recorded October 8, 2024, as document 2024046617, made among the Debtor, as grantor; Paul Krause, as beneficiary; and First American Title

---

[5] The Jackson Street DOT appears to be subordinated to the Loan 2 and 3 DOT. Mr. Reynoso asserts that the loan securing the Jacksonstreet DOT has been satisfied. The Trustee has requested information from the lender to confirm whether that obligation has been satisfied, but has not received that information.

[6] The Metropolitan DOT appears to have been assigned to Danforth LLC and Keith Daubenspeck.

LEGAL\76171115\4

Company of Napa, as Trustee, to secure an indebtedness in an unknown amount[7] ("Krause DOT," and together with the Jacksonstreet DOT, the Poppy DOT, the Metropolitan DOT, the Daubenspeck DOT, the Holtz DOT, and the Summit DOTs, the "Deeds of Trust").

25.     The Poppy DOT secures a contingent guaranty of a $12 million loan dated May 18, 2018 (the "Poppy Loan") made by Poppy Bank to Sugarloaf Ventures, LP ("Sugarloaf"), the Frank Pipgrass Revocable Living Trust dated December 11, 1997, Frank Pipgrass and Nancie Theresa Mills Pipgrass. The Poppy Loan is also secured by a vineyard estate owned by Sugarloaf. Sugarloaf filed its own chapter 11 bankruptcy case in the Bankruptcy Court for the Northern District of California. *See In re Sugarloaf Ventures*, LP, Case No. 24-10673-WJL (Bankr. N.D. Cal.). The Trustee has also been informed that the Estate received only $50,000 in consideration for the recording of the cross-collateralized Poppy Bank DOT, which warrants further investigation and verification. As a result, the Estate's contingent obligation under the Poppy DOT, if any, is unknown at this time.

26.     A UCC search obtained by the Trustee reflects that several additional creditors assert secured claims against the Debtor's personal property, which will need to be investigated by the Trustee and her professionals.[8]

27.     The Trustee estimates that the total liens, including accrued taxes, asserted against the Real Estate fall within a range of $12.3 to $12.5 million, excluding any obligations owed to Poppy Bank. All of the foregoing asserted secured claims may be subject to dispute as to default interest charged and avoidance actions under chapter 5 of the Bankruptcy Code.

---

[7] Krause has filed an unsecured proof of claim in the amount of $275,407.00 [Claim No. 8.]

[8] The Trustee does not yet have access to the documents supporting all of the purported secured claims against the Debtor's assets. The Estate obtained an Order setting a claims bar date for April 30, 2025.

**E. The Trustee's Need to Use Cash Collateral and Obtain Postpetition Financing**

28. The Trustee has an urgent and immediate need for access to funds available under the Postpetition Financing. As of the Trustee's appointment, the Debtor had less than $5 in its bank account. The Trustee has collected a total of $66,827.20 from the collection of receivables owed to the Estate from the 2024 sale of grapes from a non-Reynoso Affiliate. Summit's perfected security interest in crops means that any cash (or cash equivalents) generated from the sale of the Debtor's grapes would also constitute cash collateral of Summit (the "Cash Collateral"). In short, the Trustee would have no unencumbered cash available to administer the Case (at least, not until the Trustee is able to sell the Real Estate).

29. With the consent of Summit, the Trustee used a portion of the collected receivables to pay employee wages, withholding taxes and workers' compensation premiums. As of the filing of this motion, the Trustee has $11,496.39 of cash in her trustee account with $4,000 due for utilities. The Trustee will stop all work at the vineyard effective March 21, 2025 until the Postpetition Financing is approved by the Court.

30. Moreover, the Trustee has not received payment from the Reynoso Affiliates and the Estate currently has no control over how and when proceeds may flow to the Estate if the Reynoso Affiliates liquidate their inventory. The Trustee has also become aware that the Debtor did not perfect a grower's lien in connection with its sales of grapes to the Reynoso Affiliates. The inability to turn the bulk of the 2022 through 2024 grape harvests into cash is a key factor resulting in the severe liquidity issues contributing to the filing of the Case. The Trustee cannot rely on the collectability of any remaining Scheduled Receivables to operate and maintain the vineyard. using only Cash Collateral. Thus, given that the Trustee has no ability to rely on receivables to fund the Estate's administrative obligations, the Trustee also requires the Postpetition Financing to do so.

13

31.     As discussed above, the Trustee is currently marketing the Real Estate for sale with the assistance of a real estate broker specializing in the sale of vineyards in Northern California. The Real Estate, however, is uniquely dependent upon a properly maintained, operating and viable vineyard. If the 2025 grape crop is not viable, the value of the Real Estate will decrease by **approximately 30% or $5.7 million**. However, with no funds (much less unencumbered funds), the Trustee has no means to pay the costs to maintain the Real Estate or the vineyard.

32.     The winter months are an important part of the California grape growing cycle. In the winter months, growth and development of grape vines temporarily go dormant. While dormant, growers must prune the vines and set them up (i.e., "training the vine") for the upcoming growing season. The pruning and training of the vine are two of the most important aspects for quality grape production – growers decide how much and which parts of the previous season's growth to remove in order to regulate vegetative growth (shoots and leaves) and crop load (grape clusters) to produce quality grapes and optimum yield.

33.     Critically, the winter dormancy period is ending for the 2025 grape crop and the pruning and training of the vines must be completed before "bud break" – when first green leaves appear on the vine. Bud break typically occurs in mid to late March, some vineyards in California are seeing it earlier this year, possibly due to warmer temperatures. The Trustee has been informed that the Estate's 2025 grape crop will be irreparably harmed if the pruning and training are not completed in the next two weeks prior to bud break. A substantial loss of the 2025 crop will result in the loss of millions in value from the sale of the Real Estate.

34.     Accordingly, the Trustee urgently needs access to the Postpetition Financing in order to prevent irreparable harm to the Estate's assets on the terms contemplated herein, initially on an interim basis and, following the Final Hearing, on a final basis.

14

**F.** **The Trustee's Negotiation of the Proposed Postpetition Financing**

35.     Summit has agreed to provide the Postpetition Financing to the Trustee on the terms set forth in the DIP Loan Agreement. The terms of the Postpetition Financing and the DIP Loan Agreement were the subject of extensive and lengthy arms' length and good faith negotiations. The Trustee, in an exercise of her sound business judgment, determined that the terms of the proposed Postpetition Financing represent a fair and reasonable outcome for the Estate and should be approved by this Court.

36.     Through the Postpetition Financing and the Budget attached as **Exhibit A** to the DIP Loan Agreement (as amended or supplemented in accordance with the Loan Agreement, the "Budget"), the Trustee will have access to liquidity which the Trustee believes will be sufficient to fund the Estate's vineyard operations and accruing administrative expenses pending the sale of the Real Estate. Perhaps most importantly, the Postpetition Financing and the Budget will provide the Trustee with the working capital that the Trustee believes is sufficient to maintain the value of the Real Estate, satisfy its ongoing payroll obligations to its employees, and otherwise meet the administrative obligations in the Case.

37.     The Trustee seeks to move forward with the proposed Postpetition Financing on the terms set forth in the DIP Loan Agreement and the other DIP Loan Documents. Subject to this Court's approval, the Trustee intends to draw on the Postpetition Financing in order to satisfy the Estate's ongoing working capital needs during this Case, all in accordance with the Budget, which is intended to cover projected expenses on a monthly basis for the postpetition period through the sale of the Real Estate.

15

## V.  BASIS FOR RELIEF

**A.      The Trustee Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(d) of the Bankruptcy Code**

38.      Section 364 of the Bankruptcy Code provides the standards the Trustee must meet to obtain approval of the Postpetition Financing. *See In re Olde Prairie Block Owner, LLC*, 448 B.R. 482, 493 (Bankr. N.D. Ill.), aff'd, 460 B.R. 500 (N.D. Ill. 2011) (citing 11 U.S.C. § 364). Pursuant to 11 U.S.C. §364(d)(1), "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if – (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." The Trustee bears the burden of proof on the issue of adequate protection. *Id.*

39.      For the reasons discussed below, the Trustee satisfies the standards required to obtain the Postpetition Financing in the Case with a senior lien as to the DIP Collateral pursuant to § 364(d)(1) of the Bankruptcy Code.

**B.      The Trustee Is Unable to Obtain Financing on More Favorable Terms**

40.      Prior to the Trustee's appointment, the Debtor sought alternative financing to fund the Estate's operating expenses. While the Trustee considered and negotiated with the Debtor's proposed postpetition lender, the Trustee determined that the Postpetition Financing provides the Estate with the best postpetition financing option available and should be approved by this Court. Given the Trustee's recent appointment by the Court and the expedited need for financing, which requires the expenditure of significant funds starting this week, the Trustee believes that she will not have time to locate any other, potentially more favorable, postpetition financing in time to prevent a precipitous decline in the value of the Real Estate. In addition, funding from another

16

postpetition lender would also trigger a contested hearing regarding the priming of Summit's Pre-Petition Liens and potentially adding significant expense and delay to obtaining the necessary funding.

41.     An immediate and ongoing need exists for the Trustee to obtain the Postpetition Financing. Without entering into the Postpetition Financing, the Trustee will lack the funds to operate the vineyard or maintain the Real Estate. If the Trustee does not have the funds to pay employees to prune and train the grape vines prior to "bud break" over the next 2 weeks, the 2025 grape crop will be irreparably damaged resulting in potentially millions of dollars in lost value from the sale of the Real Estate. Simply put, a potential buyer of the Real Estate will pay millions less for the vineyard when there is no 2025 grape crop to harvest after the purchase. Consequently, without the Postpetition Financing, the Estate and all of its stakeholders will suffer irreparable harm.

42.     Summit will not extend postpetition credit to the Trustee absent superpriority priming liens pursuant to 11 U.S.C. §364(d). In light of the facts and circumstances of this Case, the Trustee does not believe that she would be able to obtain postpetition financing pursuant to §§ 364(b) or (c) of the Bankruptcy Code. Due to the immediate time frame within which she must act, and the exigencies that she faces, the Trustee believes that she would not be able to obtain postpetition financing on better terms under section 364(d) – if at all – in time to prevent a precipitous decline in the value of the Estates' assets.

43.     Notably, the Estate has no liquid assets available, which makes it impossible for the Trustee to obtain adequate unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code merely as an administrative expense pursuant to § 364(b) of the Bankruptcy Code. Further, given the lengthy list of known purported security interests asserted against the Estate's assets, the

17

Trustee cannot obtain adequate credit either (i) with priority over all other administrative expenses; (ii) secured by a lien on unencumbered estate property; or (3) secured by a junior lien on encumbered estate property pursuant to § 364(c) of the Bankruptcy Code. The Trustee is thus unable to obtain financing without a priming lien pursuant to § 364(d) of the Bankruptcy Code.

44.     The Trustee respectfully submits that her efforts to obtain postpetition financing satisfy the standard required under section 364 of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary postpetition financing, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing"). Section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable. This is particularly true when ... time is of the essence in an effort to preserve a vulnerable seasonable enterprise." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

**C.     Other Secured Creditors Interests Are Adequately Protected**

45.     In many cases, adequate protection of an interest in estate property may be provided by: "(1) making cash payments to the affected entity to the extent its interest decreases in value; (2) providing to the entity an additional or replacement lien to the extent its interest decreases in value; or (3) granting some other relief that will allow the entity to realize the 'indubitable equivalent' of its interest." *Olde Prairie Block Owner*, 448 B.R. at 493. Additionally, a sufficient equity cushion – an excess of collateral over a secured creditors claim – has also been found to provide adequate protection. *See, e.g., Id.*, 448 B.R. at 493*; In re Aaura, Inc.*, No. 06 B 01853, 2006 WL 2568048, at *2 (Bankr. N.D. Ill. Sept. 1, 2006) (<u>citing</u> *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir.1992); *In re Markos Gurnee P'ship*, 252 B.R. 712, 717 (Bankr. N.D. Ill. 1997).

18

LEGAL\76171115\4

46.      Here, the secured creditors with an interest in the DIP Collateral are adequately protected by a substantial equity cushion based on the value of the Real Estate – but only if the vineyard is preserved with the funds provided by the Postpetition Financing. As discussed above, Summit's own appraisal from July 2024 valued the Real Estate at $23 million. After accounting for current market conditions, the Trustee and her real estate broker believe the Real Estate has an overall value of at least $19 million. The known encumbrances against the Real Estate are approximately $12.5 million, excluding Poppy Bank's purported contingent secured guaranty claim. After deducting the encumbrances including the Postpetition Financing, equity of approximately $6 million remains – an equity cushion of almost 30%. The Trustee submits that this is more than sufficient to provide adequate protection for the secured claims of all lienholders that would be primed by the Postpetition Financing. *Olde Prairie Block Owner*, 448 B.R. at 493-94 (real estate developer authorized to borrow $4 million on a priming lien basis because a 38% equity cushion provided adequate protection for the prepetition secured lender).

**D.      The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

47.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the Estate and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

48.      The terms of the Postpetition Financing were negotiated in good faith and at arm's-length between the Trustee and the DIP Lender, resulting in an agreement that is designed to permit the Trustee to maximize the value of the Real Estate for all stakeholders. As a result of those negotiations, the Trustee obtained (i) a reasonable rate of interest for the Postpetition Financing,

19

(ii) a waiver of all prepetition default interest and late charges in connection with Loan No. 1; and

(iii) sufficient funding (based on the Estate's known obligations) to pay all anticipated administrative expenses through the end of 2025. In addition, the Loan 1 Roll-Up is limited to a dollar-for-dollar basis with new money loaned. The Trustee also believes that she obtained a sufficient timeline to market the Real Estate to maximize its value for all stakeholders. Following careful review, the Trustee concluded that the DIP Lender's proposed terms would allow the Trustee to meet her goals in this Case and provide the Estate with sufficient liquidity over a reasonable period of time on the best available economic terms.

49.     The Trustee submits that the proposed terms of the Postpetition Financing are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). For the reasons set forth above, the Trustee's sound business judgment clearly supports approval of the Postpetition Financing. Access to the Postpetition Financing will allow the Trustee to continue to operate and maintain the vineyard, thus maximizing value of the Real Estate for all of the Estate's stakeholders.

**E.     Interim Order and Final Hearing**

50.     Fed. R. Bankr. P. 4001 governs the use of postpetition financing and provides that the Court may authorize a trustee to obtain postpetition financing on a final basis after a hearing on at least fourteen days' notice, and may authorize a trustee to obtain interim postpetition financing "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing" on less than fourteen days' notice.

LEGAL\76171115\4

51.     The urgent need to avoid immediate and irreparable harm to the Estate makes it imperative that the Trustee be authorized to access the Postpetition Financing pending the Final Hearing in order to allow the Trustee to operate and administer this Case. Without the ability to make draws under the Postpetition Financing, the Trustee would be unable to maintain the vineyard, satisfy accruing postpetition obligations, including payroll, and would not be able to continue its operations, thus causing irreparable harm to the Estate and causing material damage to the value of the Real Estate.

52.     Pursuant to Fed. R. Bankr. P. 4001(c)(2), the Trustee respectfully requests that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding. The Trustee further requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the motion.

## VI.  <u>NOTICE</u>

53.     The Trustee will provide notice of this motion to: (a) the Office of the U.S. Trustee; (b) counsel for the Debtor; (c) counsel to the DIP Lender; (d) all parties known to assert a security interest in the Debtor's assets; and (e) any party that requests service pursuant to Bankruptcy Rule 2002. The Trustee submits that, in light of the nature of the relief requested, no other or further notice need be given.

54.     Local Rule 4001-2.E. provides, "No interim financing order that includes a provision listed in [Local Rule 4001(C)(1)(i)-(x)] will be entered except in extraordinary circumstances." By an application for an emergency hearing filed concurrently with this motion, the Trustee requests that the Court conduct an expedited interim hearing on this motion and

21

approve the Postpetition Financing set forth in the Interim Order on an interim basis, and, following the Final Hearing, on a final basis. The Trustee submits that interim relief is necessary to avoid potential immediate and irreparable harm.

## VII.  CONCLUSION

55.    The Trustee seeks approval for the Postpetition Financing from the DIP Lender in exchange for a priming lien on the DIP Collateral. The Trustee cannot obtain this credit under less onerous terms than those offered by the DIP Lender and all other parties with a security interest the DIP Collateral are adequately protected. Consequently, the Trustee respectfully submits that her entering into and obtaining financing under the Postpetition Financing would be in the Estate's best interests and should be approved by the Court.

WHEREFORE, the Trustee respectfully requests that the Court grant the relief requested by this motion, as well as any additional relief that may be appropriate.

Respectfully submitted,

Janina M. Hoskins, not individually, but as chapter 11 Trustee for the Estate of Reynoso Vineyards, Inc..

Dated: March 21, 2025

By:  /s/ Allen J. Guon
One of her attorneys

Ira Bodenstein
Allen J. Guon
Cozen O'Connor
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
P: (312) 474-4450
aguon@cozen.com

22

LEGAL\76171115\4